Filed 7/25/13  P. v. Pitts CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B242562 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA358709) |
| v. | |
| APRIL ARMENA PITTS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Monica Bachner, Judge.  Affirmed.

James Koester, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Stacy S. Schwartz and William Shin, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

April Armena Pitts was convicted of second degree robbery, and the jury found true that she personally and intentionally discharged a handgun and personally inflicted great bodily injury. Pitts was sentenced to 30 years to life. She appeals the trial court's denial of her new trial motion, arguing that her trial counsel provided ineffective assistance in failing to present evidence that someone else committed the robbery. We affirm.

## BACKGROUND

An information filed March 1, 2012 charged Pitts with one count of attempted willful, deliberate, and premeditated murder, in violation of Penal Code[1] sections 665 and 187, subdivision (a), and one count of second degree robbery, in violation of section 211. As to both counts, the information alleged that Pitts personally and intentionally discharged a handgun which caused great bodily injury, within the meaning of section 12022.53, subdivisions (b) through (d), and that Pitts personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a). The information also charged that Pitts had four prior felony convictions and was ineligible for probation under section 1203, subdivision (e)(4). Pitts pleaded not guilty and denied the allegations.

At trial, in opening statement, the defense argued that Pitts's cousin "Anna" shot and robbed the victim, not Pitts, and that Pitts confessed to the crime to protect Anna.

The victim, Rosario Schwartz, testified that she was walking on a brightly lit 3rd Street near Kings Road at around 11:20 p.m. on June 29, 2009. A girl came running up behind Schwartz, grabbed her purse (which was on her shoulder), and pulled her around. Schwartz's purse slid to her elbow and "when I whipped around, I was face to face to her, looking at her in the eyes, and she had a gun, and she's like, 'Give me your purse or I'll shoot.'" The girl was Pitts. Schwartz responded, "'Please, no. I have no money. I'm a missionary. I'm broke.'" Pitts pulled on the purse again, bringing the strap to Schwartz's wrist. Schwartz held it for a moment, but Pitts pulled the purse again and shot Schwartz in the chest. Schwartz put her hand on her chest, pulled it away and saw blood, and said,

_____

[1] All further statutory references are to the Penal Code.

"'You shot me.'" Schwartz looked at Pitts, who had a "deadly" look as if "[s]he could care less," and Pitts turned around and ran away. Schwartz thought she heard Pitts fire twice more into the air.

Schwartz saw Pitts run and get into a gold Acura Legend, which took off immediately down the street. The license plate bore the word "SHIELD." Schwartz couldn't remember how Pitts got into the car, but the car was moving forward when the door was barely closed, so she thought someone other than Pitts was driving. Schwartz went back out into 3rd Street and flagged down a car; the driver had already called an ambulance, and the driver followed the car. People came to help until the paramedics arrived and took Schwartz to the hospital. At the hospital five days later, Schwartz identified Pitts as the shooter in a photographic six-pack lineup: "As soon as they put those photos in front of me, my eyes, like bang, it was there, and I knew without a doubt that that was the girl who had shot me." Schwartz still had no doubt about her identification of Pitts's photograph. She had also identified Pitts at the preliminary hearing. The bullet tore her esophagus and both lungs collapsed, and Schwartz was still in constant pain at the time of trial.

Los Angeles Police Department (LAPD) Detective Paul Funicello was the assistant investigator of the shooting. He testified that while Schwartz was in the hospital, he showed her the six-pack photographic lineup, and Schwartz quickly identified Pitts's photograph as looking like the person who attacked her.

Anastasia Kramer testified that at around 11:20 p.m. on June 29, 2009, she was driving on 3rd Street when she heard a gunshot and saw a woman run into the middle of the road, yelling for help. Kramer slowed down, and the woman said, "I got shot," pointing at a group of two men and a woman standing on the corner near the curb. The group ran toward an Acura, jumped inside, made a u-turn, and drove off; she didn't see anyone else in the car. A man was driving. Kramer followed them in her car without losing sight of the Acura. At some point they jumped out of the car and ran off across the street. Kramer called 911, and the police arrived; she pointed out the car she had

followed. She told the police that the people in the car were two male blacks and one female, possibly Hispanic, but did not provide any further description.

At sidebar, defense counsel indicated that if the prosecution introduced the tape of Pitts's confession, he would put her on the stand. The prosecution objected to a proposed defense expert on eyewitness identification, stating that Pitts's own admission was independent evidence of her guilt; the court pointed out that the jury had not heard the confession, except for the reference to it in the defense's opening statement. Defense counsel then argued that there were issues with Schwartz's identification of Pitts, and even if the confession were introduced, he would bring out an explanation for the statement. The trial court stated that it would allow the defense expert to testify. After counsel conferred, defense counsel stated he had confirmed that the prosecution would not offer the taped confession if the expert did not testify; instead, the people would call one more witness and rest. Defense counsel then stated he wanted to confer with Pitts to discuss whether to introduce the expert testimony, although the decision of what witnesses to call was counsel's to make based on his evaluation of the evidence. After a brief recess, the prosecution indicated that it was going to call one more witness, and then rest.

LAPD Officer Juan Hernandez testified that he responded to the scene of the shooting, and then responded to an additional call which took him to where Kramer had followed the Acura. She flagged the officers down and pointed to the car, a gold Acura Legend. The license plate said "SHIELD." Officer Hernandez searched the car, and found a cell phone on the front seat, and two purses in the trunk. One of the purses contained a prescription bottle with the name April Pitts. The other purse contained various documents with the name "Quanique Anna Marie Williams." The detective could not determine the owner of the cell phone.

After Officer Hernandez's testimony, the trial judge called a brief recess so that the prosecutor could make a final determination whether to introduce the taped confession. After the recess, the prosecutor stated that there would be no more witnesses and the prosecution would rest. Defense counsel moved for dismissal under section

4

1118. When the court denied the motion, counsel stated that the defense would rest and rely on the state of the evidence.

In closing, the prosecutor argued that Schwartz's identification of Pitts was consistent and positive. Defense counsel argued that "the big issue, the overriding issue in this case, is whether or not April Pitts . . . is the person that robbed and shot Rosario Schwartz." The identification of Pitts was "so fleeting, . . . so quick, . . . so uncorroborated, that it's not reliable." The robbery occurred at night, Schwartz was face-to-face with the robber only briefly, Schwartz's description was vague, the six-pack identification occurred a few days after surgery in the hospital, and victim and robber were of different races (Pitts was African-American, and Schwartz was Hispanic or Caucasian). The prosecution failed to prove that Pitts was the robber, and the police did not do an adequate investigation. The police should have shown Schwartz photos of Williams, the other woman whose documents were found in the car, but they did "zero" investigation of Williams. Most of the property in the Acura belonged to Williams. Further, Kramer testified that the female she saw was Hispanic. In rebuttal, the prosecution argued that as to the third party, the defense brought it up in opening and closing argument, but "everywhere in between where it really, really, really counts . . . the part of the trial where evidence is presented, there's nothing about this other person." To believe that Schwartz's identification was mistaken, the jury would "have to believe that there's this person who looks just like the defendant, who happened to be out at that exact location and at that exact moment in time," and that "evil twin . . . happens to jump into a car that just happens to have property belonging to the defendant," a coincidence that was unreasonable.

The jury deadlocked on the charge of attempted murder, and found Pitts guilty of second degree robbery, finding true the firearm and great bodily injury allegations. The court found that Pitts was in violation of her probation in case number TA103512. The prosecution dismissed the attempted murder count.

Before sentencing, Pitts retained a private pro bono attorney, who intended to file a new trial motion. The court relieved public defender David Hizami from Pitts's

5

representation. The motion for a new trial argued that the public defender provided ineffective assistance of counsel in failing to present evidence that Williams, not Pitts, committed the crime; Schwartz mistakenly identified Pitts as the robber; and Pitts's confession was false, made to protect her cousin Williams and because Pitts "wackily believed that, since she was innocent, she couldn't be convicted based on her confession." At the evidentiary hearing on the new trial motion, Pitts waived the attorney-client privilege for the purposes of the hearing.

**Hizami's testimony**

Hizami testified that during the trial, he and Pitts elected to rely on the evidence presented by the prosecution (the pill bottle, the "tenuous" eye-witness identification and the "somewhat ambiguous" six-pack identification) and to argue that the prosecution had not met its burden. They had agreed that he would not call the eyewitness identification expert, because the prosecution then would have presented Pitts's confession. Had the confession come in, he would have had Pitts testify to rebut it.

Pitts had told him that she had denied being the robber in a first interview by the police before she confessed; there was no report taken of that interview. Pitts had also told Hizami that Williams had committed the robbery. Pitts had been riding in the car with Williams and two others, robbing people in the area. She got out of the car when she had had enough and tried to convince Williams to leave too, but Williams said she needed the money to support her kids. After the car drove down the street, Pitts heard a gunshot, and saw Williams and Schwartz. Pitts made eye contact with Schwartz and fled, hiding and then taking a cab home, which Williams paid for with a credit card Williams had robbed from Schwartz.

Hizami believed it would be "foolish" to verify that story or pursue it further, since it was not an alibi and instead tied Pitts to the victim in a way that would allow the prosecution to incriminate Pitts (who had also told him that her boyfriend used the credit card to buy gasoline). "[T]ying the defendant to the victim and her credit card would have caused more harm than benefit."

6

Hizami "would have loved to have gotten Anna Williams to come to court. She had a warrant out for her arrest. According to Ms. Pitts, 'she was in the wind' . . . 'hiding out'" in another state. He had seen a photograph of Williams and thought she and Pitts looked somewhat similar.[2] He did a Google search on Williams and ran her name in the Los Angeles County jail system, but at the time of the preliminary hearing and pretrial, the warrant for Williams was still outstanding and the police were still looking for her. He did not hire an investigator regarding the other people in the car, because he had no information from Pitts about who they were.

Hizami went through the confession carefully five or six times, and thought the confession was "very, very incriminating," and as he discussed with Pitts, if they presented evidence corroborating her story the confession would come in. Instead, he argued to the jury that the eyewitness identification was tenuous. He knew that there were contradictions in the confession, but on balance he believed the confession would have been more detrimental than beneficial to Pitts's defense. All of this was a tactical decision, as Hizami did not think the prosecution had met its burden. He had discussed this with Pitts over and over, and "we both elected to rely on the state of the evidence." Pitts understood that if the eyewitness expert testified, her confession would come into evidence; she also understood the pros and cons of testifying herself, and elected not to take the stand, a decision that was "hers, not mine."

Further, Hizami was aware that if Pitts testified, she would be impeached with her criminal record, and he was "most concerned about . . . the probation case that [the court] had on [its] desk when we went into chambers. I was waiting for the shoe to drop, . . . that the court or the people would realize that, wow, she's on probation for a strike, and none of you picked that up." Pitts's confession included details of other crimes that she took part in before the shooting and robbery of Schwartz, and he worried that would look bad to the jury. He had mentioned the confession in his opening

---

[2] Hizami later testified that he did not recall ever seeing a photograph of Williams, and would not have shown such a photograph to the jury unless Pitts had taken the stand to lay a foundation for who Williams was.

statement because at the time he had been told that the prosecution was going to introduce the confession into evidence.

Hizami continued to believe that Pitts was not guilty.

**Pitts's testimony**

Pitts testified that she told Hizami that Williams committed the robbery, and that she confessed to protect Williams, who had children. Pitts was in the car that night, and told Williams she was leaving and asked Williams to get out of the car, but Williams wouldn't leave. Shortly after Pitts left and when she was about a block away, she heard the gunshot. She ran in the opposite direction and took a cab to the house of another woman who was also in the car. Williams showed up later and said she had shot someone but didn't mean to, and Williams paid the taxi driver with a credit card belonging to Schwartz.

Although Hizami had a photograph of Williams (who resembled Pitts), he did not present it to the jury, telling Pitts that no matter what, Schwartz "is so stuck on this being me, that she couldn't possibly be wrong" and would say she did not recognize the photograph. Hizami also told Pitts that finding the cab driver would just tie her to Schwartz's stolen credit card. Hizami told her to tell the judge that she didn't want to testify, because "'we can hurry up and get the case done with'" and "'[i]f not, he's going to put this confession on, and that's . . . not good for you.'" Pitts had not realized her confession was being recorded.

Pitts told Hizami to go find Williams and the other people in the car. Hizami told Pitts the fewer people in the case, the better, and he never interviewed any of them. He also did not get William's phone records or the cab driver's records.

**Trial court ruling**

The trial court stated that it was not ineffective assistance that Pitts did not testify; counsel discussed it with her and she made her decision. The discussion of the confession in the opening statement was a tactical decision to address harmful evidence; further, the jury was instructed that counsel's statements were not evidence, and so this also was not ineffective assistance. As to the other possible witnesses, including

8

Williams, it was speculative what their testimony would have been, and so Pitts had shown no prejudice from their absence. The record also showed that Hizami consulted with a false confession expert and an identification expert, and on the basis of those consultations chose to rely on the state of the evidence. Counsel also made efforts to track down Williams. Counsel's decisions were reasonable given the prosecution's evidence, even if a different attorney would have made different choices. The court saw no prejudice from counsel's strategic decisions, and denied the motion for a new trial.

The trial court sentenced Pitts to pay restitution of $65,948.30 to the state victims compensation board, and other fines and fees. The court imposed the high term of five years on the robbery count, and the mandatory 25-year term for the use of a firearm causing great bodily injury. The court stayed the sentences on the other firearm enhancements. The court also revoked and terminated Pitts's probation in the other case, TA103512, without adding any consecutive time.

Pitts filed this timely appeal.

## DISCUSSION

"'We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard.' [Citations.] '"A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion."' [Citations.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 140.) Ineffective assistance of counsel, if proven, is a valid, nonstatutory ground for a new trial. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582–583; *People v. Reed* (2010) 183 Cal.App.4th 1137, 1143.) Upon appeal from the denial of a new trial motion based on a claim of ineffective assistance or other denial of constitutional rights, we apply two distinct standards of review. We defer to the trial court's factual findings if supported by substantial evidence, but we exercise de novo review over the ultimate issue of whether the defendant's constitutional rights were violated. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724–725.)

To establish ineffective assistance of counsel, a defendant has the burden of proving both that his counsel's performance was deficient under an objective standard of

9

professional responsibility and that there is a reasonable probability that but for his counsel's errors, he would have obtained a more favorable result at trial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) In examining claims of ineffective assistance of counsel, we give great deference to counsel's reasonable tactical decisions. (*People v. Hinton* (2006) 37 Cal.4th 839, 876.) "[A] court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." (*Bell v. Cone* (2002) 535 U.S. 685, 702.) Accordingly, "a court must 'view and assess the reasonableness of counsel's acts or omissions . . . under the circumstances as they stood at the time that counsel acted or failed to act.'" (*In re Scott* (2003) 29 Cal.4th 783, 812.) "'[T]he relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable.'" (*Babbitt v. Calderon* (9th Cir.1998) 151 F.3d 1170, 1173.) Further, prejudice must be established as "'"a demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel.'" (*In re Clark* (1993) 5 Cal.4th 750, 766.)

On appeal, Pitts admits that Hizami's decision not to present third-party culpability evidence was a tactical decision, but argues that it was not a *reasonable* tactical decision because Hizami failed to reasonably investigate Williams's whereabouts and whether she looked like Pitts. We disagree.

First, the trial court concluded from Hizami's testimony that he made efforts to track Williams down, and those efforts were reasonable given the strength of the prosecution's evidence. Substantial evidence supports this conclusion. Hizami testified that he "would have loved" to have Williams in court; knew that Williams was "in the wind" and had a warrant out for her arrest; learned from Pitts that Williams was hiding out in another state; and did a Google search on Williams and checked the county jail system. That investigation was reasonable, especially given that Hizami believed (and still believed at the time of his testimony) that the prosecution's evidence was weak, and he knew that if he challenged Schwartz's identification of Pitts via the eyewitness expert,

10

the prosecution would introduce into evidence Pitts's confession. Given the difficult balancing act involved in attempting to keep the jury from reading or hearing Pitts's confession, it was reasonable for Hizami not to launch an all-out attempt to find Williams. There was a warrant out for Williams's arrest, and it is difficult to imagine what efforts Hizami could have deployed to find her when law enforcement had not.

The same analysis applies to whether Hizami should have more aggressively determined whether Pitts resembled Williams. The purpose of that determination would have been to support the testimony of the eyewitness expert, and that testimony would have brought Pitts's confession before the jury.

Second, as Hizami testified (and as Pitts concedes), Hizami made a string of tactical decisions. First, he intended to challenge the eyewitness identification at trial by putting an expert on the stand. When the prosecution stated that it would then introduce Pitts's confession, Hizami withdrew the expert, in agreement with Pitts; if he had gone ahead with the expert and the prosecution had put the confession into evidence, Pitts would have testified to rebut it, and the only other story she had told tied her to the use of Schwartz's stolen credit card. Pitts elected not to testify. Had she done so, she would have been impeached with her criminal record, and that record might have alerted the prosecution or the trial court that Pitts was on probation for a strike (there were no strike allegations in the case). Under those circumstances, we cannot second-guess counsel's decision that finding Williams was not essential to his defense of Pitts.

Further, as the trial court concluded, Pitts did not demonstrate that she was prejudiced by the extent of Hizami's investigation. Hizami did argue that Schwartz's identification of Pitts was unreliable, and that the police should have investigated Williams's possible culpability. As Hizami explained, introducing additional evidence to advance the theory that Williams was the robber presented numerous dangers. Pitts has not demonstrated how Hizami's strategic decisions, made to avoid those dangers (including the discovery of the prior strike which the prosecution had not alleged), demonstrably prejudiced her. We perceive no reasonable probability that the outcome of

11

trial would have been better for Pitts if Hizami had increased his efforts to locate Williams, or had determined that the two women looked alike.

The trial court did not abuse its discretion in denying Pitts's motion for a new trial based on her allegations of ineffective assistance of counsel.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


MALLANO, P. J.


CHANEY, J.